46  415
47  767

THE CHICAGO, KANSAS & WESTERN RAILROAD COM-
PANY v. OZARK TOWNSHIP, IN ANDERSON COUNTY,
*et al.*

1. RAILROAD — *Aid Bonds — Valid Election.*  Where an election has been
held in a township authorizing a subscription to the capital stock of
a railroad company to the amount of $18,000, and authorizing the
issuing of a like amount of township bonds to the railroad company
in payment for such stock, but three days prior to the election it
was agreed between a portion of the electors of the township and
certain agents of the railroad company that if the election should
be in the affirmative the amount of the subscription and of the bonds
to be issued should be only $10,000, and the election resulted in an
affirmative vote, authorizing a subscription to be made and bonds to
be issued in the amount of $18,000, but immediately afterward, in a
proceeding instituted by a tax-payer and an elector of the township,
the officers and the railroad company were enjoined from making a
subscription or issuing or receiving an amount of bonds exceeding
$10,000, and the subscription was then made for $10,000, and the
railroad company accepted the subscription and relinquished all
claim to an amount of bonds above that amount, and afterward the
railroad was built and all the other conditions imposed upon the
railroad company by the proposition voted upon were complied
with and fulfilled by the railroad company in pursuance of such
election and of such subscription, *held*, that the railroad company
is entitled to the bonds of the township to the amount of $10,000.

2. ———— *Not a Bribe to Voters.*  Where an election is pending in a
township for the purpose of authorizing a subscription to the capi-
tal stock of a railroad company, and the issuing of bonds in pay-
ment therefor to the amount of $18,000, and while the election is
pending a portion of the electors and certain agents of the railroad
company agree that if the election should result favorably to the
subscription and the issuing of the bonds, the amount of each should
be only $10,000 instead of $18,000, *held*, that such an agreement is
not in effect or tantamount to a bribe to the voters, and will not
necessarily render the election wholly invalid.

3. ———— *Power of Township Officers.*  When authority is given to
the officers of a public corporation by an election or otherwise to
issue a certain amount of the bonds of the corporation, the officers
will have the power and the right, whenever there is a sufficient rea-
son therefor, to issue a less amount of the bonds of the corporation.

*Error from Anderson District Court.*

THIS was an action brought in the district court of Anderson county by the *Township of Ozark* against the *Colony, Neosho Falls & Western Railroad Company*, the Southern Kansas Railway Company, H. K. Winants, H. A. Bearly, and S. A. Herriman, the county commissioners, and A. D. McFadden, the county clerk of said county, to enjoin the defendants from issuing or accepting certain township bonds. It afterward appearing that the Chicago, Kansas & Western Railroad Company had, by the consolidation of various railroad companies, succeeded to all the rights of the Colony, Neosho Falls & Western Railroad Company and of other companies, the plaintiff amended its petition, making the Chicago, Kansas & Western Railroad Company a party defendant, and praying for the same relief against it as it had previously prayed for against the other railroad companies. The Chicago, Kansas & Western Railroad Company then answered, and the case was dismissed as to the Southern Kansas Railway Company. The case was tried before the court without a jury, and the court made special findings of fact and conclusions of law, as follows:

"FINDINGS OF FACT.

" 1. The plaintiff is, and was at the times hereinafter referred to, a municipal township of Anderson county. The defendant the Colony, Neosho Falls & Western Railroad Company was duly organized and incorporated as a railway corporation of this state, on the 27th day of November, 1885, to construct, operate and maintain a line of railroad from a point at or near Colony, in the plaintiff township, southwesterly into Allen, Woodson, and other counties. The Chicago, Kansas & Western Railroad Company was organized and incorporated under the laws of this state on the 21st day of November, 1885, to construct, operate and maintain certain lines of railroad in its charter mentioned, and on the 31st day of May, 1886, it succeeded by consolidation to all the rights, privileges and immunities, and to the property, estate and franchises, of said Colony, Neosho Falls & Western Railroad Company.

"2. On the 11th day of January, 1886, pursuant to a petition therefor duly presented, and in all things proper and sufficient, the board of county commissioners of this county duly convened and made an order, as provided by law in such cases, for an election to be held in said township on the 15th day of February, 1886, upon the proposition to subscribe to the capital stock of the said Colony, Neosho Falls & Western Railroad Company, and to issue the bonds of the township in payment therefor to the amount of $18,000. Due and legal proclamation and notice of said election was given, the call therefor being as set out in the petition, and the election was held accordingly, resulting in a vote of 193 for and 137 against said proposition, as shown by an official canvass of said votes duly made and declared by said board on the 19th day of February, 1886. ⸱

"3. On the 4th day of January, 1886, the said Colony, Neosho Falls & Western Railroad Company deposited in a bank at Colony aforesaid the sum of $75, to be used to pay the expenses of said election in Ozark township if the proposition was carried, but to be returned to the railroad company if it was defeated.

"4. On the 12th day of February, 1886, after full discussion and deliberation by the people upon said proposition, it became apparent to and was generally believed by the citizens of the township, and by the railroad company as well, that said proposition would be defeated as it then stood. Thereupon, on the evening of that day, the president, secretary and treasurer and board of directors held a meeting at Colony, together with about 50 citizens of that city and two farmers of the township residing outside of the city, to consider the situation. In response to inquiries from the officers of the company, it was the unanimous expression of the opinion of the citizens that the proposition as it then stood would be defeated. A vote, however, was taken by the citizens present upon the question of voting $10,000 instead of $18,000, and it was carried with only one dissenting vote. Thereupon the treasurer of the company, in the presence of the other officers and directors, stated in substance that, having heard of the probable defeat and failure of the pending proposition, the company was about to change or amend its charter so as to submit another point on the Southern Kansas Railway instead of Colony, but that the company would take a less sum than $18,000 rather than suffer the delay and start anew; that the executive committee was present with power to act, and if the

27 — 46 KAS.

sense of the meeting was in favor of $10,000, and the people would go on and vote the $18,000 proposition as it stood, the company would relinquish all over $10,000 and issue therefor that amount of stock, and file such relinquishment with the county clerk. The meeting assenting to this, the company executed a paper relinquishing such excess, and reserving the right to issue stock to the amount of the bonds to be received, viz., $10,000. The official act of the company constituting such relinquishment is set out in full in the circular copied into the petition, and was filed in the county clerk's office February 13, 1886. The said officers and directors, acting in conjunction with said citizens' meeting, caused the legal opinion, also contained in said circular, to be obtained, and immediately published said circular and circulated it generally and thoroughly in said township prior to said election. It was mailed to every voter, so far as their names could be ascertained, and posted at the polls and in other public places. It was received and read by, and otherwise came to the notice of, all or nearly all the voters. It seems to have been well understood and acted upon in good faith as a modification of the pending proposition. The object, purpose and intent of the company in taking such action was, to influence the voters of the township in favor of said proposition, and to cause the same to be carried. The effect of such action and publication and reading thereof was, to change the sentiment of the voters so as to carry said proposition, and but for such action and publication the proposition would have been defeated.

"5. After the official canvass of said vote, the board of county commisssoners ordered the county clerk to make, and the county clerk did make accordingly, a subscription upon the books of said railroad company to the capital stock of said company for shares to the amount of $10,000, and likewise ordered the chairman of said board to make, and with the county clerk to seal, sign and deliver the bonds of said township to a like amount, upon the conditions and payable as stated in the said proposition. The subscription was made by the county clerk as directed, and the proper officers were ready, willing, and about to issue said bonds when this suit was brought and the injunction allowed.

"6. On the 1st day of March, 1887, the railroad of the Colony, Neosho Falls & Western Railroad Company was built from the depot of the Southern Kansas Railway Company in Colony, within 2,000 feet of the north line of said town, as stated in the proposition, to a point beyond the east line of

Woodson county, and the road was in operation and cars running thereon on regular schedule time.   The engine, however, backed up from the western terminus to Colony, there being no turn-table at said terminus, and trains were so operated until the road was completed to Yates Center.   The track was not surfaced up all the way on the 1st of March, but that was partly done and was finished on the 1st of June following.   There is a deep cut some 600 feet in length, and at the deepest place 19 feet in depth, on the line a little south of Colony.   This was not cut wide enough prior to March 1, 1887, so that in thawing and freezing the banks caved somewhat, so as to fill up the ditches along the track.   These ditches were cleaned out and the cut was widened in the spring of 1888. The running of trains, however, was not impeded, but they have been operated regularly since February 25, 1887, and so I conclude that the road was built and operated substantially according to the terms of the proposition.

"7.  On the 19th of February, 1886, a suit was brought in this court by one J. W. Schuessler, a tax-paper of said township, who alleged in his petition against said railroad company and against the county commissioners and county clerk, defendants therein, the making of said petition and order, and the holding of said election, and the action of said company hereinbefore stated, providing for a reduction of the subscription to $10,000, and averred that the board was about to issue $18,000 in bonds so voted, whereupon a temporary injunction was allowed.   Afterward, by consent of the parties plaintiff and said county commissioners and clerk, the suit having been dismissed by the plaintiff as to the railroad company, the judge, at chambers, dissolved said injunction, and allowed another temporary injunction restraining the board and clerk from issuing more than $10,000 in amount of said bonds, and from subscribing for more than $10,000 in amount to the capital stock of said company.   Nothing further was done in said action.   This order was made March 29, 1886.   The board had not ordered nor had the clerk subscribed for said stock prior to the allowance of said first temporary injunction, and did not do so solely because of said injunction.   After the order of the district judge last above stated, said board did order and said clerk did make the subscription for $10,000 of said stock as hereinbefore stated.   The said Colony, Neosho Falls & Western Railroad Company has not, nor has its successor, the Chicago, Kansas & Western Railroad Company, ever claimed in any manner more than said $10,000 in bonds

since the relinquishment of February 12, 1886, but said companies treat the same as valid and binding."

"CONCLUSIONS OF LAW.

"1. A petition of two-fifths of the taxpayers, designating the amount of stock to be taken, the order for and notice of the election for such amount, and a majority vote therefor, are conditions precedent to a valid municipal subscription for stock in a railroad corporation.

"2. The county commissioners are the agents of the township to make such subscription, when so authorized. Such agency is, however, special and limited, depending upon the express assent of the voters, and such assent can only be given in the manner prescribed by law.

"3. When a railway company, pending a vote by the township to subscribe to its capital stock, in order to secure a majority for the proposition which otherwise would be defeated, relinquishes a part of the bonds proposed to be voted for such stock, reserving, however, a corresponding part of the stock, and the election is carried by such means, a subscription made for a part of the stock so voted is void. The township, as a contracting party, has a right to determine what amount of stock it will subscribe, and to determine it in the manner prescribed by the statute. No mere understanding with the voters, however general, can vary the result of an election.

"4. The subscription being void, and the company having full knowledge of all the facts making it void, the doctrine of equitable estoppel has no application, although the railroad was built as provided in the proposition.

"5. It follows that the bonds demanded in payment of such subscription should not be issued.

"6. Judgment for a perpetual injunction will be rendered accordingly, as prayed for by the plaintiff."

Upon the foregoing findings and conclusions, the court below rendered judgment in favor of the plaintiff and against the defendants, perpetually enjoining the defendants from issuing, delivering, accepting or receiving any of the aforesaid bonds. The *Chicago, Kansas & Western Railroad Company,* which is the successor to all the rights of the other defendant railroad companies, brings the case to this court for review, making *Ozark Township,* the county commissioners and the county clerk defendants in error.

*Geo. R. Peck, A. A. Hurd,* and *Robert Dunlap,* for plaintiff in error.

*J. D. Snoddy,* for defendants in error.

The opinion of the court was delivered by

VALENTINE, J.: The court below, in rendering judgment in this case, delivered the following opinion, to wit:

"This is an action to restrain the issuance of bonds claimed to have been voted by Ozark township to pay for stock in the Colony, Neosho Falls & Western Railroad Company. It is conceded that a proper petition was presented, the order made, notice given and the election held according to law. It appeared, however, that, three days before the day named for the election, the voters of the township and the railroad company alike became convinced that the proposition, which was for a subscription for stock to the amount of $18,000, and the issuance of bonds therefor, would be lost, but it was believed that a less sum could be voted. Thereupon, as the result of a meeting of the board of directors with some 50 citizens of the township, the company offered, if the proposition was carried, to, and did, relinquish its claim to all but $10,000 of the bonds, reserving the right to issue only that amount of stock. Such offer and relinquishment, duly executed by the proper officers of the company, were thereupon published, posted, and mailed to the voters, who were thereby induced to and did vote for the bonds, so that the proposition was carried. But for such action, it would have been defeated. The company filed its relinquishment to such excess with the county clerk. The board duly canvassed the vote, declared the proposition carried, and ordered the clerk to subscribe for $10,000 only of said stock, upon the terms and conditions stated in the petition, order, and notice, which was done. The company, having built its road as provided in the proposition, offered to deliver the proper certificates for $10,000 of said stock, and demanded the issuance and delivery of the bonds. No claim is made to the $8,000 excess, but the relinquishment thereof is treated as valid and effectual by both parties.

"The exact question then is, whether upon a petition, order, notice, and election, under the act in question, (Comp. Laws of 1885, pp. 783–4,) authorizing a subscription for a certain amount of stock, a township can be legally compelled to ac-

cept and pay for a less amount, under the circumstances appearing in this case. The sole authority for such subscription is the statute, and § 69 provides: 'Before such subscription . . . shall be made, the question shall first be submitted to the qualified electors of the township at a special or general election, as . . . specified in the petition, which petition shall also designate the railroad company, and the amount of stock proposed to be taken.' The next section requires that such petition shall be presented, the board convened, and the order made, 'embracing the terms and conditions set forth in the petition.' Manifestly, the presentation of such a petition, signed by two-fifths of the resident tax-payers, is a condition precedent to the order of the board, and the order for and the affirmative vote upon the proposition so submitted are conditions precedent to the subscription. The commissioners are the agents of the township. (*U. P. Rly. Co. v. Comm'rs of Davis Co.*, 6 Kas. 256; *L. L. & G. Rld. Co. v. Comm'rs of Douglas Co.*, 18 id. 169; *Turner v. Comm'rs of Woodson Co.*, 27 id. 314.) But such agency is special and limited, and rests upon the express assent of the voters. (*Lewis v. Comm'rs of Bourbon Co.*, 12 Kas. 186.) The preliminary steps constitute the authority of the commissioners to make the subscription, which is the contract. (*U. P. Rly. Co. v. Comm'rs of Davis Co.*, supra.) The vital question is, whether the subscription is valid, and this must depend upon the power of the commissioners to make it under the existing facts. That power, we have seen, 'rests upon the express assent of the voters,' and that assent must be shown in the manner provided by law. There must, of course, be a valid election authorizing, not *a* subscription, but *the* subscription actually made. (*Gulf Rld. Co. v. Comm'rs of Miami Co.*, 12 Kas. 230; *Lewis v. Comm'rs of Bourbon Co.*, 12 id. 186.) And before the election there must be a petition, not for a proposition to subscribe generally, but designating 'the amount of stock proposed to be taken;' and then thirty days' notice must be given. A less time invalidates the bonds that may be voted. (*George v. Oxford Township*, 16 Kas. 72.) A special election, as the court says in the case last cited, 'depends for its validity upon being legally called, and upon legal and proper notice thereof being given.' Now, if we attempt to uphold this subscription upon the argument that the reduction of the amount by the company, accepted and acted upon in good faith by the voters, was equivalent to a change in the proposition, we are met by the difficulty already indicated by the citation of authorities,

viz., that there was no petition, order or notice for an election upon such a modified proposition, all of which steps are jurisdictional. Besides, the people had only two days' notice upon which to consider and discuss the grave matter of placing a lien upon all the taxable property of the township. They had already discussed, and, it appears, condemned the pending proposition. Who shall say that they might not have repudiated this new and modified one, had time for deliberation and discussion been given? But, passing over all questions as to the petition and notice, the election itself, when canvassed in any manner known to the law, did not authorize the subscription made. The will of the voter must be determined from the ballot; its language must govern when the terms used are such as to make known his will beyond a reasonable doubt. (*Clark v. Comm'rs of Montgomery Co.*, 33 Kas. 202.) It cannot be that the terms used, taken in connection with the proposition submitted, plain and certain as they were in the case, can be varied or contradicted by any prior understanding of the voters, however general, that their ballots should be held to mean something different. If elections are to depend upon such loose and uncertain considerations, then a government resting upon the ballot is indeed precarious.

" Nor can this subscription be upheld upon the proposition that the greater includes the less. · Possibly, that might be urged if this was a donation or gift, merely, but it is not. This was an attempt to subscribe for stock in a railroad company, and to pay therefor, as any other subscriber, dollar for dollar. It was a business venture which, however hazardous, the township might engage in, provided lawful methods were observed. If A offers to take stock in a corporation to a given amount, which offer is accepted, can he be legally·compelled to take and pay for a less amount? Every man has a right to determine the quantity of any commodity he will buy, and the seller may not be allowed to coerce him into taking less. And a township contracting for stock in a railroad company is after all only a contracting party, and, being charged with the liabilities, it must have the corresponding rights of any other. So, here, this township had the right to determine what amount of stock it would take, and it could only determine it in the way provided by law. Solemn legal formalities, carefully designed to protect the tax-payer against the improvident assumption of grievous burdens by the voters, are not to be lightly set aside by the resolutions of a casual meeting of citizens. This is a government of laws. It is free

because it rests on the consent of the governed; but that consent must be given by certain well-defined methods sanctioned by law. The vast volume of municipal debt incurred in aid of railroad building is a sufficient reminder that the legal barriers against the hasty assumption of such burdens are none too strong, and certainly should not be weakened by judicial interpretation. The conclusion is that the subscription in question was made without lawful authority, and is void.

"It is urged, however, with great earnestness, and with reference to the numerous authorities, that the township is estopped from denying the validity of the subscription, the road having been built in reliance upon it. The law of equitable estoppel, however, cannot be invoked, for two reasons: First, the subscription, which is the contract, being void, no legal rights in favor of a party to it can be founded upon it; (*Sheldon v. Donohoe*, 40 Kas. 346;) and second, because the railroad company had full knowledge that the preliminary steps did not warrant the commissioners in making the subscription. The company did not build its road rightfully relying upon the validity of the subscription, for it initiated and carried out the very proceedings that made the subscription void. (Bigelow, Estop., pp. 466, 467; *Bernstein v. Smith*, 10 Kas. 60; *People v. Cline*, 63 Ill. 394.)

"After all, it seems that the simple inquiry is whether the forms of law have been complied with so far as to make a valid contract. If they have, it should be sustained; if they have not, it must fall. The court cannot make and then enforce a contract. Certain solemn forms of procedure have been prescribed to protect the tax-payers, that nothing be done without their consent. These are all the protection the tax-payer has, and should not be frittered away by judicial construction. So says our supreme court in substance in *Lewis v. Comm'rs of Bourbon Co.*, 12 Kas. 186. It must be remembered that this is not a case where the municipality has received the fruit of another's labor or expenditure, and refuses to pay therefor, although retaining and enjoying such fruits, as in *Sleeper v. Bullen*, 6 Kas. 300. Nor is it the case of part performance by one, and acceptance by another. The company owns its road; it has parted with nothing which the township has received; the township has accepted and appropriated none of its materials or labor. The road was not built for the township, but for the company. It was built presumably for profit, as a legitimate business enterprise, and now the township declines to accept and pay for the stock

offered, for the reason that it never·contracted to do so. (*M. K. & C. Rly. Co. v. Parsons*, 24 Kas. 170.)

"The injunction against the issuance of the bonds should be made perpetual."

The paramount question presented in this case is substantially as follows: Where an election has been held in a township authorizing a subscription to the capital stock of a railroad company to the amount of $18,000, and authorizing the issuing of a like amount of township bonds to the railroad company in payment for such stock, but three days prior to the election it was agreed between a portion of the electors of the township and certain agents of the railroad company that, if the election should be in the affirmative, the amount of the subscription and of the bonds to be issued should be only $10,000, and the election resulted in an affirmative vote authorizing a subscription to be made and bonds to be issued in the amount of $18,000, but immediately afterward, in a proceeding instituted by a tax-payer and an elector of the township, the officers and the railroad company were enjoined from making a subscription or issuing or receiving an amount of bonds exceeding $10,000, and the subscription was then made for $10,000, and the railroad company accepted the subscription and relinquished all claim to an amount of bonds above that amount, and afterward the railroad was built and all the other conditions imposed upon the railroad company by the proposition voted upon were complied with and fulfilled by the railroad company in pursuance of such election and of such subscription, is the railroad company entitled to the bonds of the township to the amount of $10,000? We think this question must be answered in the affirmative.

1. Railroad—aid bonds—valid election.

It is contended, however, by the township that the aforesaid agreement between a portion of the electors of the township and the agents of the railroad company, that, if the election should result favorably to the subscription and the issuing of the bonds, the amount of the subscription and the bonds should be only $10,000 instead of $18,000, was in effect or tantamount

**2. Not a bribe to voters.** to a bribe to the voters, which rendered the election absolutely and wholly invalid. There certainly cannot be anything in this. And it does not appear that the court below so held.

It is also claimed that the election was not an election at all for any purpose, for the following reasons: First, it is claimed that it was not an election for a subscription and bonds to the amount of $18,000, for the reason that a portion of the electors and the agents of the railroad company agreed otherwise; and, second, it is claimed that it was not an election for a subscription and bonds in the amount of $10,000, or any other amount less than $18,000, for the reason that no valid election was ever called, ordered or provided for, for any less amount than $18,000. Now we think the election was in fact an election, and that *prima facie*, and upon the records of the county and township, it was an election for a subscription and bonds to the amount of $18,000, but in all fairness and justice it was an election for a subscription and bonds in a sum not exceeding $10,000. We think the election was valid to the extent at least of authorizing a subscription and the issuing of bonds to the amount of $10,000; or, in other words, it was not wholly void.

It is also claimed that there cannot in any case be a subscription made or bonds issued for any less amount than that actually voted for by the electors of the township. This certainly cannot be true, as has already been held by this court in the case of *Turner v. Comm'rs of Woodson Co.*, 27 Kas. 314. This question has also been virtually decided in the same way by the supreme court of Alabama. (*Winter v. City Council of Montgomery*, 65 Ala. 403; same case, 7 Am. & Eng. Rld. Cases, 307.) This last case cited is as nearly in point, as nearly applicable, as nearly analogous, to the present case as it could well be, and we know of no authority to the contrary; and the principle enunciated in the cases cited is substantially, that when authority is given to the officers of a public corporation, by an election or otherwise, to issue a certain amount of the

bonds of the corporation, the officers will have the

**3. Power of township officers.**

power and the right, whenever there is a sufficient reason therefor, to issue a less amount of the bonds of the corporation. This we think is good law; and we think there was and is ample reason for the issuing of Ozark township bonds to the amount of $10,000 instead of $18,000. Besides, it is evidently greatly more to the interest of Ozark township that only $10,000 in amount of its bonds should be issued than that the whole amount of $18,000 of its bonds should be issued. The township has by the election and subscription procured the railroad to be built, and has obtained all that it expected to obtain from the railroad company. The railroad has been built and equipped in accordance with the election and subscription, and it is now to the interest of the township that as small an amount of its bonds should be issued as is possible. The stock of the railroad company is probably worth but little, and the issuing of the bonds for such stock is virtually a donation. This is nearly always the case in similar transactions, and all well-informed persons know it. Undoubtedly the railroad company would be perfectly willing to issue to the township $18,000 of its stock if it could thereby procure a like amount of the township bonds. Such a thing would be very much like giving nothing for something. The object of the law in permitting public corporations to subscribe for stock in railroad companies, and to issue their bonds in payment therefor, is not intended as a business transaction like that consummated by an individual when he purchases stock and pays therefor in money or in something else. It is merely for the purpose of procuring greater facilities for travel and transportation for the general public, which is always considered as a public purpose, and not merely as a private purpose, enterprise, or business transaction. The act itself authorizing counties, townships and municipal corporations to subscribe for stock in and to issue bonds to railroad companies is entitled "An act to enable counties, townships and cities to aid in the construction of railroads," etc. (Laws of 1876, chapter 107.) This shows that the main object of the

act was to enable counties, townships and cities *"to aid in the construction of railroads,"* and was not to permit such corporations to engage in such transactions as a mere business venture, or as an investment in stocks, or a speculation in bonds and stocks. Twenty years ago it was said by this court, in the case of *Comm'rs of Leavenworth Co. v. Miller,* 7 Kas. 528, 529, 532, among other things, as follows:

"If a railroad company is purely a private corporation, and if the construction and operation thereof is purely a private purpose, neither the government nor any municipal corporation has any right to become a stockholder therein. Governments were not organized for the purpose of engaging in private enterprises or private business, but only for the transaction and promotion of public affairs. Even if the purchase of stock in a railroad company should be a paying transaction as an investment, (which, unfortunately for counties and municipal corporations, it is not,) still a governmental organization would have no right, for that reason alone, to engage in it, for governmental organizations are not created for purposes of speculation, nor are they created for the purpose of enriching the organization as such, but only for the purpose of promoting the general welfare of the individual members thereof as citizens. The increased facility for travel and transportation is the main object in the creation of railroads, and this it is which constitutes a railroad a public purpose. All other benefits, though belonging of right to the public, are simply incidental." (Pages 528 and 529.)

"The opening of hotels, the running of stage-coaches, hacks, drays, etc., have never been considered as incumbent upon governments. Governments have never undertaken to keep hotel, run stage-coaches, etc., and it has never been considered that there was any moral or legal obligation resting upon them to do so. But the duty of opening highways, canals, and other like improvements for the accommodation of travel and commerce, has always been considered most binding upon all governments." (Page 532.)

In the case of *Winter v. City Council of Montgomery,* above cited, the supreme court of Alabama used the following, among other language:

"We do not discover that the city council varied the propositions which were submitted to and approved by the voters

at the election. The proposition was, when fairly construed, that the city should extend aid to the railroad company by the issue of its bonds to an amount not exceeding one million of dollars, which were to be employed in building and equipping the road. It was not pecuniary gain, nor any of the advantages which would accrue to an individual from membership in the railroad company, that formed a motive or inducement for clothing the city with the power to aid in the construction of the road. The benefits which would result to the commerce and industry of the city, the increased facilities of access to it, were the purposes for which the power was conferred. If these could be secured without involving the city in a debt of one million of dollars, it was not only within the power, but it was the duty of the city council to secure them for the least practicable sum. The power to create the larger included the power to create the lesser debt. *Omne majus continet in se minus.*" (Page 319.)

The sovereign power of eminent domain is always exercised in favor of railroads, because they are considered as public purposes, as instruments of commerce and of travel and transportation, and not because of any stock which might be held in them by any public corporation.

We do not think that the agreement between a portion of the electors of Ozark township and the agents of the railroad company prior to the election, or anything else that occurred prior or subsequent to the election, will so invalidate the election or so destroy the rights or claims of the railroad company that it may not demand and receive the bonds of Ozark township up to the amount of $10,000, and we so decide without reference to any question of estoppel or of *res adjudicata;* and we might here say that the railroad company claims under both. It claims that as the township permitted the railroad company to construct and equip its railroad upon the faith of the aforesaid election and subscription, the township is now estopped from claiming that either the election or the subscription is void; and that, as the injunction suit between the aforesaid tax-payer and elector of Ozark township and the railroad company and the officers whose duty it might be to make the subscription and to issue the bonds of the township

resulted in the granting of an injunction restraining the subscription and the issuing of the bonds only to the extent of the excess over and above $10,000, and permitting the officers to make the subscription and to issue the bonds to the amount of $10,000, and permitting the railroad company to accept and receive such an amount of the township bonds, all the substantial questions presented in this case were virtually adjudicated in and by that case, and have become *res adjudicata.*

The judgment of the court below will be reversed, and the cause remanded with the order that judgment be rendered in favor of the defendants below and against the plaintiff below.

All the Justices concurring.